IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | Case No. 10-00043-01-CR-W-DGK |
| MICHAEL C. MOYLAN, | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Moylan's Motion to Suppress Evidence (doc #17). For the reasons set forth below, it is recommended that this motion be denied.

I. INTRODUCTION

On February 10, 2010, the Grand Jury returned a one count indictment against defendant Michael C. Moylan. The indictment charges that on December 21, 2009, defendant Moylan, having been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm, a 9mm rifle, which had been transported in interstate commerce.

On April 27, 2010, an evidentiary hearing was held on defendant's motion to suppress. Defendant Moylan was represented by Assistant Federal Public Defender Laine Cardarella. The Government was represented by Assistant United States Attorney Paul Becker. The Government called Officer Chad McReynolds, Officer Larry Mead and Captain Ronnie Johnson of the Carrollton, Missouri Police Department, and Ciara Aldrich as witnesses. The defense called Townes Staton to testify.

II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. Ciara Aldrich testified that she lived with Michael Moylan in a trailer house located at the corner of Metropolitan and 65 Highway. (Tr. at 40) In the early morning hours of December 21, 2009, Aldrich and Moylan had a fight. (Tr. at 40) At approximately 4:30 a.m., the police and an ambulance arrived. (Tr. at 40-41)

Aldrich testified that she spoke to an officer and told him that she wanted to go to Moylan's parents' house. (Tr. at 41) According to Aldrich, the officer said that he would talk to her after the medical personnel checked her out, but that he did not come back and talk to her, leaving her with Moylan. (Tr. at 41, 50) Aldrich testified that the physical fight with Moylan continued. (Tr. at 41)

2. Ms. Aldrich testified that at approximately 11:00 a.m., defendant Moylan had fallen asleep on the couch and she was able to send a text message to Moylan's mother. (Tr. at 41-42) Moylan's step-father, Townes Staton, came to the trailer to get Aldrich. (Tr. at 42) Aldrich got in Staton's vehicle. (Tr. at 42) They drove up the hill. (Tr. at 43) Aldrich said the police arrived at the trailer about thirty seconds later. (Tr. at 44)

3. At approximately 11:07 a.m., Officer Chad McReynolds was dispatched to investigate a domestic disturbance that involved a firearm at a trailer house located at 1330 North 65 Highway. (Tr. at 4-5) Officer McReynolds requested that the dispatcher send additional officers as back-up. (Tr. at 5) When Officer McReynolds arrived at the scene, Bobby Barlow, an off-duty deputy from the Carroll County Sheriff's Department was already there. (Tr. at 5, 10) The two officers were walking around looking at the trailer and in the window[1] to see if anyone was around, when Townes Staton and Ciara Aldrich pulled up. (Tr. at 6, 44) Officer McReynolds knew Staton and Aldrich from prior contacts. (Tr. at 6) Officer McReynolds also knew Michael Moylan. (Tr. at 15) Officer McReynolds knew that Moylan and Aldrich lived together in the trailer. (Tr. at 15)

4. Officer McReynolds asked Mr. Staton and Ms. Aldrich what was going on. (Tr. at 7) Aldrich advised that Michael Moylan had put a gun to her head earlier that morning. (Tr. at 7) Officer McReynolds asked Aldrich if Moylan was inside and she said yes, on a couch. (Tr. at 7, 44) Officer McReynolds asked Aldrich where the gun was and she said she did not know. (Tr. at 8, 44) Officer McReynolds testified that he asked for Aldrich's consent to go into the residence to get Michael and she said yes. (Tr. at 7, 11) Aldrich testified that the officer did not specifically ask for her permission or consent to go into the trailer, but Aldrich did tell the officer that the door was unlocked and that Moylan was on the couch. (Tr. at 44, 58) Officer McReynolds waited for other officers to arrive at the scene. (Tr. at 8) Staton and Alrich drove back up the hill. (Tr. at 8, 44)

5. Officer Larry Mead was at home at 11:07 a.m. when he heard the dispatch to a domestic violence call at 1330 North 65 Highway. (Tr. at 16) Officer Mead knew that Michael Moylan and Ciara Aldrich were living in the trailer at that address. (Tr. at 17) Officer Mead responded to the scene. (Tr. at 16) When he arrived, Officer McReynolds, Officer Lorraine Lester and Deputy Barlow were already at the scene. (Tr. at 17) Officer Mead observed Officer McReynolds go talk to Townes Staton and Ciara Aldrich when they pulled up to the location. (Tr. at 17-18) Officer Mead could not hear what they said. (Tr. at 18) Officer Mead testified that Officer McReynolds came back and Chief of Police Donnie King and Troy Hostetter, the sheriff of Carroll County, showed up. (Tr. at 18)

---

[1] Officer McReynolds testified that he could not see anything inside the trailer because the blinds were closed. (Tr. at 12)

6. Officer Mead testified that because there had been two domestic disturbance calls within a twelve-hour period, the decision was made to arrest defendant Moylan. (Tr. at 22) The officers went into the unlocked trailer and found Moylan sitting on a couch in the living room. (Tr. at 8, 11, 18) Chief King arrested Moylan and Officer McReynolds along with Sheriff Hostetter escorted Moylan out and put him in McReynolds' patrol car. (Tr. at 8) Officer Mead testified that he did not hear any officer question Moylan about the alleged assaults on Ms. Aldrich or the possession of the gun. (Tr. at 24) Officer McReynolds transported Moylan to the Carroll County Sheriff's Department. (Tr. at 9) Sheriff Hostetter followed in his patrol car. (Tr. at 13) Officer McReynolds testified that Moylan appeared to him to be in an intoxicated state of mind. (Tr. at 13) Officer McReynolds did not ask Moylan any questions. (Tr. at 14)

7. Captain Ronnie Johnson testified that he was contacted at approximately 11:14 a.m. by the dispatcher concerning an officer needing assistance. (Tr. at 26) Captain Johnson was told there was a report that Michael Moylan was threatening to shoot his girlfriend, Ciara Aldrich. (Tr. at 26) Captain Johnson was familiar with Moylan and Aldrich and knew that they lived together. (Tr. at 26, 34) Captain Johnson testified that he was probably the last to arrive on the scene. (Tr. at 27) As Captain Johnson was walking up, Officer McReynolds and Sheriff Hostetter were bringing Moylan out. (Tr. at 27) Captain Johnson spoke briefly with Officer McReynolds. (Tr. at 28) Captain Johnson testified that Officer McReynolds advised him that Chief King and Officer Mead were inside the trailer searching for the weapon. (Tr. at 35) Captain Johnson further testified that although he does not recall the exact conversation, Officer McReynolds told him that he had consent to search from Aldrich. (Tr. at 35-36) Captain Johnson then went inside the trailer. (Tr. at 28) Approximately six officers were still at the scene when Officer McReynolds and Sheriff Hostetter took defendant Moylan away. (Tr. at 13)

8. Captain Johnson testified that there were a lot of broken objects all over the floor of the trailer, even a television was completely shattered out. (Tr. at 28-29) Assorted knives were lying all over. (Tr. at 29) Captain Johnson testified that Ms. Aldrich came into the trailer right behind him.[2] (Tr. at 29, 35) Captain Johnson asked Aldrich what the gun looked like. (Tr. at 29) Aldrich replied that she did not know, it was just a long black gun. (Tr. at 29) Captain Johnson testified that Aldrich said she wanted the gun found and wanted it out of there. (Tr. at 29) Aldrich testified that the officers asked if she had any problem with them searching and she said no. (Tr. at 59) According to Aldrich, "Basically yes, they did ask [permission]." (Tr. at 59) Aldrich testified that the officers had not started searching before she entered the trailer. (Tr. at 60) Aldrich sat in a chair inside the trailer while the officers searched for the gun. (Tr. at 45) Aldrich never told the officers to stop searching or to get out of the trailer. (Tr. at 45)

9. Captain Johnson went outside to check the perimeter of the building. (Tr. at 29) Ms. Aldrich testified that she was not asked specifically if it was alright for the officers

---

[2] Contrary to the testimony of Captain Johnson and Ms. Aldrich, Townes Staton testified that Ms. Aldrich was not allowed to enter the trailer. (Tr. at 68-69) Given Staton's testimony that there were thirty to forty people standing outside the trailer and that he was talking to his son (Tr. at 69), the Court finds that Staton may have been distracted and not noticed Aldrich going into the trailer.

3

to look around outside. (Tr. at 60) As he stepped off the porch, Captain Johnson bent over and looked back up under the steps and saw the rifle lying under the porch, plain to see. (Tr. at 29-30)

10. Officer Mead testified that he helped search for the firearm while inside the trailer, but no firearm was found. (Tr. at 18-19) Officer Mead testified that Captain Johnson found the firearm outside, under the front porch. (Tr. at 19, 23) Officer Mead photographed the stairs leading to the front door of the trailer (Government's Ex. 6) and the firearm as it was found lying beneath the stairs, directly below the front door to the trailer (Government's Ex. 7). (Tr. at 19-20) The photographs were taken 35 to 40 minutes after officers were dispatched to the scene. (Tr. at 19) The firearm was not moved before it was photographed. (Tr. at 30)

11. Captain Johnson testified that Townes Staton, the owner of the property, was present when the officers were trying to decide how to remove the gun from under the stairs without tearing up the property. (Tr. at 31-32) Staton said just break the lattice off and then he walked over and pulled it off. (Tr. at 32) Staton does not remember removing the latticework, but he believes that either he or his stepson Adam removed it. (Tr. at 70-72) Captain Johnson then reached in through the hole in the lattice and pulled the gun out. (Tr. at 31-32) The gun was loaded with a round in the chamber and additional rounds in the magazine. (Tr. at 32) Staton testified that he had no objection to the officers recovering the gun from underneath the stairs. (Tr. at 73)

12. Captain Johnson took the gun back into the trailer. (Tr. at 33) There was a hole in the wall that appeared to have been made by the butt of a gun. (Tr. at 33) Captain Johnson put the butt of the gun that had been recovered in the hole and it appeared to be a perfect fit. (Tr. at 33) Captain Johnson asked Ms. Aldrich if this was the gun she was talking about and she identified the gun as the one they were looking for. (Tr. at 33)

13. The gun was taken to the police department. (Tr. at 33)

14. At 1:59 p.m., Ms. Aldrich gave a handwritten statement to Sheriff Hostetter. (Tr. at 52, 54) The statement provided:

> On Sunder the 21st Michael Moylan and I (Ciara Aldrich) got into an argument. Michael shoved me and I fell down. I got back up he shoved me again a few min later I fell again & hurt my back and head from falling down. I went to the hospital[3] to get checked out. I left the hospital and came home. I went to bed. I woke up at about 4 a.m. to Michael telling me to wake up. He started fighting w/ me & telling me to get up. I got up & he started pushing me around threatening me telling me that I wasn't on his side & that his step father was trying to kill him & I was in on it. I told him no I wasn't and he smacked me telling [me] I was lying. I came out to the couch & was sitting on the couch when he started throwing things around the house

---

[3]Ms. Aldrich testified at the hearing that she went to the hospital after an injury from a fall while hanging curtains, not because she was assaulted by defendant Moylan. (Tr. at 46-47, 50) While at the hospital, Aldrich tested positive for oxycodone (Aldrich testified she has a prescription for oxycodone because of a broken back she suffered at age 16) and marijuana. (Tr. at 47)

4

> breaking everything. I got to the phone & text his mom that I needed help. She apparently called the police station & they came out on a domestic violence call. I only talked to the ambulance people and the cops left. As soon as they left the fighting started immediately. He just kept physically & mentally abusing me. Sometime in the middle of everything he brought out a gun that he had. He was walking around threatening me that he was going to take our son to Florida & that I wasn't ever going to see him again. He sat the gun down against the wall & walked toward me than started hitting me again. He grabbed the gun & put the barrel in his mouth & told me to shoot him & I started screaming & telling him no. He said do you want shot it's either me or you. He then put the gun back down still abusing physically & mentally. I picked the gun up & pointed at him to tell him to let me leave. He came to me and grabbed the gun away from me & then pointed the gun to me and ask me how I liked it to have a gun pointed at me. I started screaming to just leave me alone. He then put the gun down. I went back to the couch more yelling & he started breaking everything in the house & still threatening me that I wasn't ever going to leave him. Finally after an hour or two Michael fell asleep on the couch & I got the phone & texted his mother to come and get me. Townes showed up and they had called the cops.. We waited and they came and brought him out of the house. End of statement.

(Defendant's Ex. 8) Captain Johnson testified that he did not participate in the interview of Aldrich. (Tr. at 39)

## III. DISCUSSION

Defendant Moylan seeks to suppress all evidence obtained during a search of his home on December 21, 2009, on the basis that such evidence was obtained in violation of defendant's rights under the Fourth Amendment. (Motion to Suppress Evidence at 1) In support of the motion, defendant argues that the search of the area beneath the front porch/deck was a warrantless and unreasonable search of the curtilage of his home. (Id. at 3)

The Fourth Amendment protects the home from warrantless searches and seizures. See United States v. Dunn, 480 U.S. 294, 300 (1987). However, an exception to this protection occurs where proper consent has been voluntarily given. See United States v. Matlock, 415 U.S. 164, 165-66 (1974). The Supreme Court has set forth the following with respect to whether a warrantless entry of a residence is valid when based upon the consent of a third party:

> The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects. The prohibition does not apply, however, to situations in which voluntary consent has been obtained ... from a third party who possesses common authority over the premises. ...

5

> ... "[c]ommon authority" rests "on mutual use of the property by persons generally having joint access or control for most purposes ..."

Illinois v. Rodriguez, 497 U.S. 177, 181 (1990)(citations omitted).

In this case, the Court finds that Ms. Aldrich had authority to consent to a search of the premises and that she consented to the search. The officers had been called to the residence to investigate a domestic disturbance involving a firearm. (See Fact No. 3, supra) Ms. Aldrich advised Officer McReynolds that Michael Moylan had put a gun to her head earlier that morning. (See Fact No. 4, supra) While Aldrich advised Officer McReynolds where he could find Moylan, she did not know where the gun could be found. (Id.) Officers knew that Moylan and Aldrich lived together in the trailer. (See Fact Nos. 3, 5 and 7, supra) Captain Johnson testified that Ms. Aldrich told him that she wanted the gun found and that she wanted it out of there. (See Fact No. 8, supra) Ms. Aldrich testified that the officers asked if she had any problem with them searching and she said no, so in Aldrich's words, "Basically yes, they did ask." (Id.) Aldrich, who sat in a chair inside the trailer while the officers searched for the gun, never told the officers to stop searching. (Id.) While Ms. Aldrich testified that she was not asked specifically if it was alright for the officers to look around outside (see Fact No. 9, supra), the Court finds that Aldrich's consent was not limited to the interior of the trailer. Aldrich wanted the gun found and removed from the premises. (See Fact No. 8, supra) Thus, the officers had consent to search from a person who had authority to provide that consent.

In the alternative, the Court finds that no consent to search was necessary as the firearm was observed to be in plain view. Captain Johnson found the rifle as he stepped off the porch and looked back up under the steps. (See Fact No. 9, supra) It is settled law that an officer may seize an object in plain view without a warrant provided the officer is lawfully in the position from which he views the object, the object's incriminating character is immediately apparent and the officer has a lawful right to access the object. See United States v. Khabeer, 410 F.3d 477, 482 (8th Cir. 2005). See also Payton v. New York, 445 U.S. 573, 587 (1980)("The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to

associate the property with criminal activity.") A driveway and front door are not "protected curtilage." See United States v. Khabeer, 410 F.3d 477, 481-82 (8th Cir. 2005)("[N]o Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors–such as driveways, walkways, or similar passageways.")(quoting United States v. Reed, 733 F.2d 492, 501 (8th Cir. 1984). See also United States v. Ventling, 678 F.2d 63, 66 (8th Cir. 1982). From the pictures presented at the hearing, Government's Exhibits 1 through 7, it is clear that the steps leading to the front door are open to the public. In addition to the fact that the steps to the porch were open to the public, Captain Johnson was justifiably present on the steps as he had responded to a domestic disturbance call at the trailer. The investigation of the domestic disturbance call had not yet concluded[4] when Captain Johnson observed the rifle in plain view under the steps. The rifle was seized after a report that it had been used to assault Ms. Aldrich. The owner of the property, Mr. Staton, pulled the latticework off the porch so that Captain Johnson could retrieve the rifle. (See Fact No. 11, supra) Mr. Staton testified that he had no objection to the officers recovering the gun from underneath the stairs. (Id.) The seizure of the rifle was proper under the "plain view" doctrine.

## IV. CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Moylan's Motion to Suppress Evidence (doc #17).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

---

[4] Ms. Aldrich did not give her handwritten statement until 1:59 p.m. (See Fact No. 14, supra) The rifle was photographed 35 to 40 minutes after officers were dispatched to the scene. (See Fact No. 10, supra)

/s/ Sarah W. Hays
SARAH W. HAYS
UNITED STATES MAGISTRATE JUDGE